Mrs. Ethel Lucille IRVIN, individually and on behalf of the surviving children of Robert Calvin Irvin, deceased,

v.

William W. BEDFORD.

No. 15176.

United States Court of Appeals Fifth Circuit.

June 30, 1955.

Stovall Lowrey, Charles L. Sullivan, Clarksdale, Miss., Richard B. Booth, Aberdeen, Miss., for appellant.

Thomas Fite Paine, Aberdeen, Miss., for appellee.

Before HOLMES and BORAH, Circuit Judges, and DAWKINS, District Judge.

BORAH, Circuit Judge.

Plaintiff brought this action against defendant for the recovery of damages on account of the death of her husband Robert Calvin Irvin, who was killed in a collision between an automobile driven by decedent and a truck driven by William W. Bedford, the defendant. The complaint alleged that the collision was the result of the negligence of the defendant in operating his truck at an excessive rate of speed; in failing to keep to his right hand side of the road; in failing to yield to the automobile of the deceased, when meeting, one-half of the traveled portion of the road; and in failing to keep his truck under control.

At the conclusion of plaintiff's case the trial court sustained the motion of defendant for directed verdict, and plaintiff appeals from the judgment of dismissal entered upon the verdict so directed. The question on this appeal is whether the evidence considered in the light most favorable to the plaintiff presented a submissible case under permissible determination and application of the law of Mississippi where the accident occurred.

The accident happened upon or near a highway bridge on a frequently traveled farm-to-market road in Monroe County, Mississippi. The bridge was 22 feet wide and 22 feet long and was of concrete construction with steel guard railings on each side. The road at the scene of the accident runs approximately east and west and is a paved highway 22 feet

in width. In approaching the bridge from the west, the road is straight and level, but upon reaching the bridge the highway curves to the north and inclines slightly upward, reaching its greatest elevation about six hundred yards east of the bridge. On the afternoon of the day in question defendant was driving his truck in an easterly direction and Irvin, the decedent, was meeting him driving his car in a westerly direction In the violent collision which ensued Irvin was instantly killed and thus is so happens that the defendant and his hired negro helper are the only living eye-witnesses to the occurrence. The latter did not testify.

On the trial the plaintiff first called the defendant as an adverse witness under Rule 43(b) F.R.C.P. 28 U.S.C.A. and then, without any restrictions, limitations or objection, the defendant was examined and cross-examined in respect to every detail of the occurrence. The defendant also identified first for the plaintiff and then for his own benefit certain photographs which show the conditions as they existed at the scene of the accident following the collision. The following in substance is the testimony which he gave. He testified that his truck and brakes were in good condition and that the weight of the truck and the load of hay which he was carrying was approximately 10,000 pounds; that he was traveling east on the highway at 35 or 40 miles per hour and keeping to his right or south side of the road; that as he approached the bridge where the accident happened he observed the Irvin automobile about 300 yards beyond the bridge and noticed that it was over on his side of the road and rapidly approaching at a speed of 50 or 60 miles per hour; and it continued to travel at that speed until it struck his truck on the bridge. He said the Irvin car was straddling the center line of the highway when he first saw it; that it swerved back and forth and came far over into his traffic lane and then when some 300 yards away Irvin cut back toward his side of the road and, as he did, the rear

wheels of his car swung around and off the pavement and kicked up gravel on the shoulder of the road; that "for a split second" he thought Irvin was getting his car under control and that he was going to get back on his right hand side of the road, but he never did.

The defendant further testified that he was about 50 yards from the west end of the bridge when he first saw the Irvin car and that he immediately applied his brakes and began to slow down; that he then gradually pulled over to his own right side of the highway until the right wheels of his truck were about a foot off the pavement and over on the shoulder of the road. According to defendant's estimate he was then only 20 feet from the abutment to the bridge. He said that he had slowed down to about twenty-five miles per hour by the time he reached the bridge and that he was not trying to stop his truck because he thought the driver of the oncoming car was going to straighten up and get back on his side of the road, and had the decedent done so there would have been enough room on the bridge for the two vehicles to pass each other in safety as the bridge was 22 feet wide and his own truck at its widest point measured only 92 inches. However, and at the moment when he drove the front end of his truck on the bridge, he realized that the other car, which was then right at the bridge, was not going to get back on its side of the road and was going to collide with his truck. In an effort to avoid the collision the defendant says that he turned his truck to the right and got as close as he could to the bridge railing; that in fact he got so far over that the right dual wheels of his truck struck the abutment to the bridge and then, and at about the same time, the Irvin car ran into the left front fender and body of his truck. That upon striking the abutment of the bridge the rear wheels and axle came out from under the truck and came to rest straddle of the bridge railing and the rear of the truck continued to travel on top of the railing while the front wheels scraped against the side of the

railing until the truck came to a complete stop approximately two feet beyond the east end of the bridge. Following the collision the defendant says he got out of his truck and walked back across the bridge and found Irvin's lifeless body lying beside his wrecked car which was over in the ditch on the north side of the road facing in the direction from which it had come. The defendant was asked if he knew whether the automobile was knocked off the road at an angle or whether it spun clockwise into the ditch and his answer was that he did not know because he couldn't see it. The defendant was also asked if he could tell the jury what part of decedent's automobile was struck by the hay bed on the truck and his reply was that he felt reasonably certain "it was the door from the cowl, from the back part of it because the back part of it was hanging on my [his] truck."

From the testimony and the photographs in evidence it is clear that the truck and the automobile first collided fender to fender and that then the protruding square corner of the body of the truck caught the Irvin car at or near the left front door and literally tore the whole car apart, smashing to pieces the entire left side of the car and demolishing the top. Several witnesses who were in the vicinage testified that they were attracted to the scene by the sound of the collision, while others, who were as far away as one half mile, swore that they likewise heard the "loud noise". The evidence thus lends itself to the view that there must have been considerable speed involved in a collision of such force and violence.

It was the contention of the defendant that he was on the right side of the road traveling east at 35 or 40 miles per hour as he approached the bridge, and that before he reached the bridge he saw the decedent's car on the same side of the road coming west at an estimated speed of 50 or 60 miles per hour. No witness saw the defendant's truck when it was in close proximity to the bridge but it is the testimony of the witness Jones that he met this truck on the road about a mile and a half west of the bridge, and it was then traveling at an estimated speed of 50 miles per hour. As to the Irvin car, other witnesses say it was traveling at a low rate of speed. The witness, Roberts, whose home was up on the hill some 400 to 600 yards east of the bridge testified that when decedent pulled out of his driveway and started west toward the bridge his old 1939 Chevrolet "was missing and jerking and jumping along" and that he watched it until it went out of view 150 yards from the bridge and it was not running over 25 or 30 miles per hour.

The evidence as to the place where the collision occurred is also in sharp conflict. It was the contention of the defendant that it occurred on the bridge and in his traffic lane on the south side of the road. The circumstantial evidence for the plaintiff tends to show that the collision took place west of the bridge and in the north traffic lane of the highway where decedent had a right to be. This affirmatively appears from the account of two of plaintiff's witnesses who testified that there was a collection of shattered glass, dirt and debris on the road fifteen or twenty feet west of the bridge, and two and a half feet to the north of the center line, which would be in the lane of traffic occupied by decedent's car and opposite the place where said car came to rest on the north shoulder of the highway.

■■ We think that the evidence on behalf of the plaintiff and the reasonable inferences to be drawn therefrom in the light most favorable to plaintiff, made out a *prima facie* cause of action which entitled plaintiff to go to the jury. Where, as here, not only the facts constituting the conduct of the parties, but also the standard of care which they should have exercised, are to be determined, the case is entirely one of fact and to be decided by the jury and not one of law for the court. Under Mississippi law the questions of negligence

are generally for the jury, and the particular facts involved in this case, in our opinion, should have gone to the jury and the jury should have determined under appropriate instructions, whether defendant was negligent, and whether his negligence was the proximate cause of the collision. Ripley v. Wilson, 140 Miss. 845, 105 So. 476, 478. As was stated in the case of Bell v. Southern R. Co., 87 Miss. 234, 30 So. 821, "So many questions are integrated usually into the solution of the question of negligence—it is so necessary to carefully examine all the circumstances making up the situation in each case—that it must be a rare case of negligence which the court should take from a jury." This is not such a rare case. We express no opinion of course, on the merits of plaintiff's claim.

The judgment of the District Court will be reversed and the case remanded for a new trial.

Swan, Circuit Judge, dissented.